1  **KESSLER TOPAZ**
2     **MELTZER & CHECK, LLP**
   Eli Greenstein (217945)
   One Sansome Street, Suite 1850
3  San Francisco, CA 94104
   Telephone: (415) 400-3000
4  Facsimile: (415) 400-3001

5  -and-

6  Eric L. Zagar (250519)
   Robin Winchester
7  Christopher M. Windover
   280 Kind of Prussia Road
8  Radnor, Pennsylvania 19087
   Phone: (610) 667-7706
9  Facsimile: (267) 948-2512

10 *Counsel for Plaintiff*

11             UNITED STATES DISTRICT COURT

12      FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14 ROGER EKMAN, Derivatively on Behalf of
   Nominal Defendant EDISON
   INTERNATIONAL,

15

16               Plaintiff,

17      v.

18 THEODORE F. CRAVER, JR., JAGJEET S.
   BINDRA, VANESSA C. L. CHANG,
19 RICHARD SCHLOSBERG, III, LINDA G.
   STUNTZ, ELLEN O. TAUSCHER, PETER J.
   TAYLOR, BRETT WHITE,
20

21            Defendants,
     and
22 EDISON INTERNATIONAL,
23
           Nominal Defendant.
24

Case No. **'15CV1918 L    WVG**

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

25

26

27

28

Plaintiff Roger Ekman ("Plaintiff"), by his undersigned attorneys, based on a comprehensive review of publicly available information, alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought for the benefit of nominal defendant Edison International ("Edison" or the "Company") against certain members of its Board of Directors (the "Board") who have engaged in and/or knowingly permitted unlawful conduct that has jeopardized a multi-billion dollar regulatory proceeding settlement and exposed the Company to hundreds of millions of dollars in additional liability.  Through this derivative action, Plaintiff seeks, *inter alia*, to hold the Individual Defendants liable for breaching their fiduciary duties to the Company.

2.     At all relevant times, the Company, through its wholly-owned subsidiary Southern California Edison ("SCE"), maintained a majority ownership stake in a nuclear generating facility located in south San Clemente, California, called the San Onofre Generating Station ("SONGS"). In 2010 and 2011, the Company installed replacement steam generators at SONGS.  In January 31, 2012, a leak occurred in one of the heat transfer tubes of a replacement steam generator located in Unit 3 at SONGS, which ultimately led the Company to permanently retire Units 2 and 3 at the facility.

3.     In the aftermath of the shutdown, on October 25, 2012, the California Public Utilities Commission ("CPUC") issued an Order Instituting Investigation ("OII") for the stated purposes of initiating an investigation into: (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS unit; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates.   Several consumer advocacy groups representing the interests of California public utility ratepayers also participated in the SONGS OII proceedings.

4.     On November 20, 2014, the CPUC entered a decision approving the settlement reached by the parties to the SONGS OII (the "November 20, 2014 Decision").  The primary terms of the settlement provided for ratepayers to pay approximately $3.3 billion in costs that included, *inter alia*, those costs attributable to replacement power purchased by the utility companies for

ratepayers in the aftermath of the SONGS outage and the recovery of certain undepreciated net investments in SONGS assets, such as the base plant located at the facility.  The settlement also provided that the utilities would, *inter alia*, provide ratepayer refunds and credits of approximately $1.45 billion.

5.  The November 20, 2014 Decision also approved a provision of the settlement agreement that resulted in a "multi-year project, undertaken by the University of California (or a UC-affiliated entity), funded by shareholder dollars, to spur immediate practical, technical development of devices and methodologies to reduce emissions at existing and future California power plants tasked to replace the lost SONGS generation."  The settlement describes this as the "Greenhouse Gas Research and Reduction program," and directs Edison to donate to the project $4 million of shareholder funds annually for a period of up to five years.

6.  The November 20, 2014 Decision found that Edison, as one of the settling parties, presented the settlement as a fair compromise of contested issues which was the result of "hard fought" negotiations in which it "compromised substantially" from positions taken throughout the OII proceeding.

7.  The true nature of the Company's involvement in the SONGS OII negotiations began to surface on February 9, 2015 by means of a Late-Filed Notice of *Ex Parte* Communication filed by Edison in the SONGS OII proceeding (the "February 9, 2015 Filing").  Since that time, the Company has disclosed hundreds of additional pages of *ex parte* communications that reveal a continuous and pervasive effort by the Company to manipulate the outcome of the SONGS settlement through improper *ex parte* interactions with CPUC decision makers and personnel. Despite the Company's knowledge of its duty under CPUC rules to disclose such *ex parte* communications in a prompt and complete manner, the Company, with the explicit knowledge and approval of the Board, instead illegally concealed these voluminous communications from the other parties to the OII proceedings.

8.  The most damning of these *ex parte* communications involves a March 26, 2013 meeting in which a senior SCE executive engaged in an extensive and substantive discussion with the then-president of the CPUC concerning the framework of a SONGS settlement that would be

1    most advantageous to the Company.  When a search warrant was executed on the home of then-

2    president of the CPUC in January 2015, investigators discovered several pages of notes from the

3    March 26, 2013 meeting that were written by the SCE executive, with annotations by the then-

4    president of the CPUC.

5         9.    The disclosure of these *ex parte* communications by the Company sent the consumer

6    advocacy groups that were parties to the SONGS settlement into an uproar.  These groups have,

7    *inter alia*, requested that the CPUC impose sanctions on the Company, impose a ban on all

8    communication between the Company and the CPUC regarding SONGS, and modify or reopen the

9    SONGS investigation and settlement.  The consumer advocacy groups assert that the Company's

10   failure to timely and completely disclose its *ex parte* communications with the CPUC constituted

11   fraud and resulted in a settlement agreement on materially different terms than those that would

12   have been agreed to had the *ex parte* communications been properly disclosed.  Consequently, the

13   SONGS OII settlement is in jeopardy, and Edison could now be required to pay additional hundreds

14   of millions of dollars as part of the proceeding.

15        10.    In addition to the fallout in the OII proceedings, Edison is currently under

16   investigation by the State of California Department of Justice – Office of the Attorney General

17   ("California Attorney General") as a result of, among other things, the *ex parte* communications as

18   described above.  On or about July 6, 2015, the California Attorney General executed multiple

19   search warrants against the Company, including at its headquarters outside Los Angeles, and

20   warrants on CPUC's headquarters as well.  These most recent warrants seek, among other things, e-

21   mail correspondence involving at least two dozen people throughout both organizations.  People in

22   the highest ranks of leadership at both Edison and the CPUC are included in these warrants.

23                              **JURISDICTION AND VENUE**

24        11.    This Court has jurisdiction over this action pursuant to 28 U.S.C.  § 1332 in that the

25   Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds

26   $75,000, exclusive of costs and interests.  This Court has supplemental jurisdiction over the state

27   law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not collusive so as to

28   confer jurisdiction on a Court of the United States.

12.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one of more of the Defendants resides in this District, Defendants have engaged in activities that had an effect in this District and are directly related to the wrongdoing alleged herein.

**PARTIES**

13.     Plaintiff, a citizen of Minnesota, is a shareholder of the Company and has been a shareholder of Edison continuously at all times relevant to this matter.

14.     Nominal Defendant Edison is an entity incorporated under the laws of the State of California, maintains its principal executive offices at 2244 Walnut Grove Avenue, Rosemead, California, and is therefore a citizen of California.  Edison is the parent holding company of SCE, which is a public utility primarily engaged in the business of supplying and delivering electricity to the southern California region.

15.     Defendant Theodore F. Craver, Jr. ("Craver"), a citizen of California, has served as Edison's Chief Executive Officer ("CEO") and President and as the Chairman of the Board since 2008.

16.     Defendant Jagjeet S. Bindra ("Bindra"), a citizen of Texas, has served as a director of Edison and SCE since 2010. At all relevant times, Bindra was a member of the Audit Committee and the Finance, Operations & Safety Oversight Committee.

17.     Defendant Vanessa Chang ("Chang"), a citizen of Texas, has served as a director of Edison and SCE since 2007.  At all relevant times, Chang was the Chair of the Audit Committee and a member of the Compensation & Executive Personnel Committee.

18.     Defendant Richard T. Schlosberg, III ("Schlosberg"), a citizen of Texas, has served as a director of Edison and SCE since 2002.  At all relevant times, Schlosberg was a member of the Compensation & Executive Personnel Committee and he currently serves as Chairman of the Nominating/Corporate Governance Committee.

19.     Defendant Linda G. Stuntz ("Stuntz"), a citizen of Virginia, has served as director of Edison and SCE since 2014.  At all relevant times, defendant Stuntz was a member of the Finance, Operations & Safety Oversight Committee and the Nominating/Corporate Governance Committee.

20.     Defendant Ellen O. Tauscher ("Tauscher"), a citizen of the District of Columbia, has served as a director of Edison and SCE since 2013.  At all relevant times, Tauscher was a member of the Audit Committee and the Finance, Operations & Safety Oversight Committee.

21.     Defendant Peter J. Taylor ("Taylor"), a citizen of California, has served as director of Edison and SCE since 2011.  At all relevant times, Taylor was a member of the Audit Committee and the Compensation & Executive Personnel Committee.

22.     Defendant Brett White ("White"), a citizen of California, has served as director of Edison and SCE since 2007 and as Lead Director since 2014. At all relevant times, White was Chairman of the Compensation and Executive Personnel Committee and a member of the Nominating/Corporate Governance Committee.

23.     The defendants named in paragraphs 15 through 22 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### The SONGS OII Settlement

24.     SONGS is a retired nuclear power plant located in south San Clemente, California. The Company owns a 78% stake in SONGS and San Diego Gas & Electric ("SDG&E") owns a 20% interest in the facility.  SONGS contains three units:  Units 1, 2, and 3.  In 2006, Edison advised the United States Nuclear Regulatory Commission ("NRC") of its intention to replace the steam generators for Units 2 and 3.

25.     The replacement steam generators at Units 2 and 3 were put into operation in January 2010 and February 2011, respectively, and SONGS returned to commercial operation in February 2011.

26.     In early 2012, failures relating to the replacement steam generators at Units 2 and 3 were discovered.  These failures ultimately rendered SONGS permanently inoperable in June 2013.

27.     On March 19, 2012, the NRC dispatched an inspection team to gather facts regarding the SONGS failures.  The NRC's investigation culminated in a report that found, among other things, design flaws in the replacement steam generators at SONGS.

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                      -5-

28.     The SONGS outages resulted in the filing of several ratesetting proceedings before the CPUC by and between various consumer advocacy groups, SCE, SDG&E, Mitsubishi (the manufacturer of the failed replacement steam generators), and insurance carriers.  Among the issues presented in these proceedings was the proper allocation of the costs associated with the SONGS failure between the public utility companies and California ratepayers.

29.     On October 25, 2012, the CPUC issued the OII and commenced an investigation into SCE's role in the SONGS outage.  The stated purposes of the OII were to investigate: (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS unit; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates.  The OII was issued by, among other people, then-President of the CPUC Michael Peevey ("Peevey") and then-Commissioner of the CPUC Michael Florio ("Florio").  The OII also consolidated the various ratesetting proceedings into a single matter.  The OII encompassed SCE, SDG&E, the Officer of Ratepayer Advocates ("ORA"), The Utility Reform Network ("TURN") and the Alliance for Nuclear Responsibility ("ANR").

30.     On April 3, 2014, SCE, SDG&E, TURN, ORA, and other related parties filed a joint motion for adoption of a settlement agreement that, if approved, would resolve all issues involved in the OII proceedings.  All interested parties, however, did not agree to the settlement, and as such, commentary on, and objections to, the settlement were lodged in the OII proceedings.

31.     On September 5, 2014, the CPUC issued an Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement (the "Request to Adopt Modifications").   The Request to Adopt Modifications was issued by Commissioner Florio and Administrative Law Judges Melanie M. Darling ("ALJ Darling") and Kevin R. Dudney ("ALJ Dudney").  Notably, the Request to Adopt Modifications asked the settling parties to:

> [A]dd a provision which will result in a multi-year project, undertaken by the University of California (or a UC-affiliated entity), funded by shareholder dollars, to spur immediate practical, technical development of devices and methodologies to reduce emissions at existing and future California power plants tasked to replace the lost SONGS generation.

Specifically, the Request to Adopt Modification provided that SCE would donate $4 million annually, for a period of up to five years, with all such donations deriving from shareholder funds. The foregoing project is hereinafter referred to as the "Greenhouse Gas Initiative."

32.   On September 19, 2014, the settling parties filed responses to the Request to Adopt Modifications acknowledging that the settling parties intended to accept the CPUC's proposed modifications to the settlement agreement, including the Greenhouse Gas Initiative.  Accordingly, on September 24, 2014, the settling parties submitted an amended settlement agreement in compliance with the Request to Adopt Modifications.

33.   On November 20, 2014, the CPUC approved the amended settlement agreement. The primary terms of the settlement provided for ratepayers to pay approximately $3.3 billion in costs that included, *inter alia*, those costs attributable to replacement power purchased by the utility companies for ratepayers in the aftermath of the SONGS outage and the recovery of certain undepreciated net investments in SONGS assets, such as the base plant located at the facility.  The settlement also provided that the public utilities would, *inter alia*, provide ratepayer refunds and credits of approximately $1.45 billion.  The settlement further provided for the creation of the Greenhouse Gas Initiative, which would run for a term of five years and be funded by SCE in the amount of $4 million annually.

34.   The November 20, 2014 Decision found that SCE, as one of the settling parties, presented the settlement as a fair compromise of contested issues which was the result of "hard fought" negotiations in which it "compromised substantially" from positions taken throughout the OII proceeding.

### Ex Parte Communications

35.   Proceedings before the CPUC are governed by, among other things, the Public Utilities Code (the "Code") and the CPUC's Rules of Practice and Procedure (the "Rules").  The Code and Rules provide specific directives regarding *ex parte* communications in CPUC proceedings such as the SONGS OII.  Rule 8.1(c) generally defines an "*ex parte* communication" as a written or oral communication between an "interested person" and a CPUC "decision-maker" about an issue before the CPUC that is stated or provided outside the formal proceeding process.  A

"decision-maker" can be, among other people, a CPUC Commissioner or an Administrative Law Judge.  An "interested person" includes, among other people, parties in a CPUC proceeding.  *Ex parte* communications in ratesetting proceedings such as the SONGS OII are subject to the stringent reporting requirements of Rule 8.4, which provides, in pertinent part, that:

> Ex parte communications that are subject to these reporting requirements shall be reported by the interested person, regardless of whether the communication was initiated by that interested person. Notice of ex parte communications shall be filed within three working days of the communication. . . .

36.   CPUC proceedings adhere to specific legal procedures to ensure due process, including how and when someone may communicate substantive matters with CPUC "decision-makrers."  The purpose of the CPUC's *ex parte* communication rules is to ensure that all parties in a proceeding before the CPUC have equal access to information.

37.   Undoubtedly, the Company was aware of its obligations under the Code and the Rules.  The OII states, in pertinent part, that:

> Communications with decision makers and advisors in this rulemaking are governed by Article 8 of the Rules of Practice and Procedure.  Specifically, Rule 8.3(c) states that *ex parte* communications in ratesetting proceedings are subject to the restrictions stated in Rule 8.3, and the reporting requirements set forth in Rule 8.4.

38.   Additionally, on September 25, 2014, nearly two months prior to the November 20, 2014 settlement conference, Edison's Chief Ethics and Compliance Officer sent an e-mail to Company personnel stating: "While we are well aware of the CPUC's *ex parte* communications rules, this situation makes clear that awareness of the rules is not enough."

39.   Despite the Company's knowledge of its reporting obligations under the CPUC Rules and the OII, Edison, with the explicit knowledge and approval of the Board, nonetheless failed to timely report its numerous *ex parte* communications with CPUC decision-makers and personnel.  This failure is illustrated by, among other things, a SCE policy that was included as a hyperlink to a press release the Company issued on February 9, 2015.  That document, dated February 2, 2015, is an internal company policy titled "Communications and Interactions with the California Public Utilities Commission."  An information field at the top of the document states

"Supersedes[:] N/A – New Policy," which indicates that prior to February 2, 2015, SCE had no policy regarding *ex parte* communications with the CPUC.

### The Company's Very Late Disclosure of the Warsaw Meeting and Immediate Fallout in the SONGS OII Proceeding

40.     Despite the Company's knowledge of its reporting obligations under CPUC's rules and the OII, Edison, with the explicit knowledge and approval of the Board, engaged in numerous undisclosed substantive *ex parte* communications with CPUC personnel throughout the SONGS OII proceedings.

41.     The most damning of these *ex parte* communications took place on March 26, 2013 between SCE Executive Vice President of External Relations Stephen Pickett ("Pickett") and then-President of the CPUC Peevey at a hotel in Warsaw, Poland (the "Warsaw Meeting").  The Warsaw Meeting took place more than two months before settlement negotiations commenced in the SONGS OII proceedings in mid- to late-June 2013.  Pickett, who is also the former General Counsel of the Company, retired from the Company on November 30, 2013.

42.     Edison did not disclose the Warsaw Meeting until February 9, 2015, when it filed the February 9, 2015 Filing.  Notably, the February 9, 2015 Filing was not made until after: (i) Peevey had resigned from the CPUC, effective December 31, 2014; (ii) the California Attorney General had seized handwritten notes from the Warsaw Meeting during a January 2015 raid on Peevey's home; and (iii) the Company had purportedly implemented its first *ex parte* communication policy on or around February 2, 2015.

43.     In the February 9, 2015 Filing, Edison revealed that Pickett had recently provided the Company with further information about the Warsaw Meeting, which Pickett conceded "may have crossed into a substantive communication."  Edison further revealed that Pickett's notes from the Warsaw Meeting included a set of possible settlement terms, provided by Peevey, concerning how costs might be allocated if SONGS were to permanently shut down.  The Company also disclosed that Peevey retained the notes, which were presumably in the hands of the California Attorney General by the time of the February 9, 2015 Filing.

44.   Also on February 9, 2015, Edison issued a press release announcing its "Strengthened Policies Governing Contacts with the Commission." Included in the Press Release was a copy of the aforementioned policy titled "Communications and Interactions with the California Public Utilities Commission." As discussed above, one of the information fields at the top of the document states: "Supersedes[:] N/A – New Policy," which leads to the unavoidable inference that this was the first *ex parte* communication policy the Company had implemented. Also included in the press release was a copy of the aforementioned e-mail from Edison's Chief Ethics and Compliance Officer dated September 25, 2014.

45.   The very next day, recognizing Edison's flagrant disregard for CPUC's *ex parte* communication rules, ANR filed a motion for sanctions against the Company in the SONGS OII proceeding. The motion for sanctions read, in part:

> By failing to timely disclose the "approximately" 30-minute [Warsaw Meeting], at which SCE provided a status update on its SONGS Unit 2 restart efforts and responded to President Peevey's comments regarding an acceptable resolution to [the SONGS OII], SCE severely prejudiced [ANR] and all other parties to this proceeding. Rule 8.3(c)(2) required that all other [SONGS OII] parties be afforded "an individual meeting of a substantially equal period of time" with President Peevey.

> The severity of this violation is self-evident: Unit 2 restart efforts were a core subject of Phase 1 of the Commission's investigation, and SCE now admits discussing "a framework for a possible resolution of the entire Order Instituting Investigation" with the Commission President nearly seven weeks before the Phase 1 evidentiary hearings even commenced.

46.   In that same filing, ANR revealed strong evidence of previous *ex parte* communications involving Edison that were alluded to in a June 7, 2013 analyst call:

> Despite [ANR] calling attention to the oversight in its June 28, 2013 Phase 1 Opening Brief, SCE has yet to report the ex parte communications between Edison International CEO Ted Craver and President Peevey which Mr. Craver acknowledged in his June 7, 2013 teleconference with financial analysts concerning the permanent shutdown of SONGS. As Mr. Craver interjected into an exchange with a Morgan Stanley analyst, "Steve, this is Ted Craver I want to just add a little bit in here. The last couple of days I've been on the phone with the Governor, as well as President Peevey." While phone calls with the Governor are not reportable, communications with President Peevey are covered by CPUC Rule 8.4.

SCE's late-filed Notice of Ex Parte Communication concerning Mr. Pickett's Warsaw meeting with President Peevey just 10 ½ weeks earlier, and its focus on "a framework for a possible resolution of the [entire] Order Instituting Investigation," certainly raises questions about whether Mr. Craver's phone calls addressed [SONGS OII] subject matter.   The likelihood that they did is enhanced by the following exchange between Mr. Craver and Bloomberg News reporter Mark Chediak in a telephonic press conference with journalists on June 7, 2013 subsequent to the financial analyst teleconference:

**Mark Chediak**
A question here regarding certain possible head to shareholders here. You guys disclosed some figures in your release.  But what is – ultimately, what could shareholders ultimately be on the hope for here regarding cost recovery? It sounds like that's going to be decided largely by the CPUC. And kind of the second part of that question is when do you see some clarity from the CPUC on cost recovery?

**Theodore F. Craver** – Chairman, Chief Executive Officer and President
Yes, great questions.  So let me try it this way.  In terms of the final determination  .  .  . that will be a matter of resolving the order institution investigation on [SONGS] that the [CPUC] started back in November of last year.  So . . . there's no way to have an exact idea of what potential liability to shareholders could be until we get all the way through that process.  **I saw earlier this morning that President Peevey from the [CPUC] has urged, I think, it was the word he used, parties to get together and try to work our some sort of a settlement of all of these items and bring it to the commission.** But whether it goes through that kind of a process, a settlement process, or it goes through the standard litigated process, in the OII proceeding, we will end up eventually with an answer to the question. (Emphasis in original).

Notably, the communications referenced by Craver took place weeks prior to the beginning of formal settlement negotiations in mid- to late-June 2013.

47.     On February 24, 2015, Edison filed with the United States Securities and Exchange Commission ("SEC") its Form 10-K for the fourth quarter and fiscal year 2014. The Form 10-K carries the signatures of defendants Bindra, Chang, Craver, Schlosberg, Stuntz, Sutton, Tauscher, Taylor, and White, and discloses in part:

In October 2012, the CPUC issued an OII that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement  project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On November 20, 2014, the CPUC approved the Amended and Restated Settlement Agreement (the "San Onofre OII Settlement Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties"). The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. SCE has recorded the effects of the San Onofre OII Settlement Agreement. Such amounts do not reflect any recoveries from third parties by SCE.

A lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application for rehearing of the CPUC's decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

***The CPUC Embarks Upon an Extensive Inquiry into the Company's Ex parte Communications Relative to the SONGS OII Proceeding***

48.     On April 10, 2015, the California Attorney General provided CPUC with a two-page document containing the notes from the Warsaw Meeting.  The CPUC, in turn, produced the notes to the parties in the OII proceeding and other parties who had previously requested copies through the California Public Records Act.

49.     Later that day, the Company issued a press release titled "Southern California Edison Statement on San Onofre Nuclear Plant Settlement," which read in part:

ROSEMEAD, Calif., April 10, 2015 — Notes filed today in federal court relate to a notice Southern California Edison filed in February with the California Public Utilities Commission (CPUC) regarding a conversation with a CPUC commissioner in 2013. The notes underscore numerous differences between the conversation in 2013 and the final settlement of the San Onofre nuclear plant investigation. The notes were drafted by then SCE executive Stephen Pickett, with annotations by CPUC President Michael Peevey, who requested the

meeting to get an update on efforts to restart San Onofre. As SCE explained in the CPUC notice, on March 26, 2013, Mr. Peevey initiated a communication in which he expressed his thoughts on the structure of a possible resolution of the Order Instituting Investigation (OII) for the San Onofre nuclear plant. Mr. Peevey indicated he would consider such a resolution acceptable but would nonetheless require agreement among at least some of the parties to the Investigation.

50.     Edison continued its pattern of deficient and untimely disclosures with its April 13, 2015 filing of a "Supplement" to the February 9, 2015 Filing.  This filing consisted of copies of the notes from the Warsaw Meeting, which the Company acknowledged were drafted by Pickett with annotations from Peevey.

51.     The next day, ALJ Darling and ALJ Dudney issued an Administrative Law Judges' Ruling Directing Southern California Edison Company to Provide Additional Information Related to Late-Filed Notices of Ex Parte Communications.  The ruling found that "[t]he Late-Filed Ex Parte Notice offered little information about the content of the meeting between Commission President Peevey and SCE's Executive Vice President" and directed SCE to provide the following additional information to the CPUC and the parties no later than April 29, 2015: (a) documents pertaining to oral and written communications about potential settlement of the SONGS OII between any SCE employee and CPUC decision makers between March 1, 2013 and November 31, 2014; and (b) internal written communications which reported, discussed, referred to, or otherwise contained a description of oral or written communications about settlement with CPUC decision makers.  The ruling further directed SCE to file notices of any undisclosed communication identified in part (a) or any other oral or written *ex parte* communication relating to the substantial issues described in the OII proceedings.

52.     On April 17, 2015, ORA issued a press release titled, "ORA Director Joe Como Response to Conduct by Southern California Edison and Former CPUC President Michael Peevey to Undermine the SONGS Settlement Process," which states in part:

SAN FRANCISCO, April 17, 2015 – The Office of Ratepayer Advocates (ORA), the independent consumer advocate within the California Public Utilities Commission (CPUC) wants *at least $648 million* returned to customers of Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E) because of recently revealed evidence of inappropriate

conversations between former CPUC President Michael Peevey and Edison Executive Vice President Stephen Pickett. These two individuals worked in secret to outline an acceptable financial settlement of the San Onofre Nuclear Generating Station (SONGS) closure. This back-channel deal between a regulator and the utility may have undermined the efforts of ORA and The Utility Reform Network (TURN) to negotiate the best deal for ratepayers.

ORA is outraged at the revelations regarding CPUC rule violations that occurred prior to the commencement of the SONGS settlement negotiations, and that Edison's actions have undermined the results of ORA's good faith negotiations to represent the best interests of ratepayers. ORA looks forward to actively participating in any investigation to uncover further wrongdoing.

On February 9, 2015, ORA first became aware of the discussion between Peevey and Pickett when Edison filed with the CPUC a 2-year late *ex parte* notice of the meeting that occurred in March 2013 in Warsaw, Poland. On Friday April 10, 2015, we learned that the conversation outlined a framework for a SONGS settlement and was memorialized on hotel stationery (commonly referred to as the Hotel Bristol Notes). ORA had not seen the Hotel Bristol Notes until they were publically released one week ago by the California Attorney General.

\* \* \*

The process for fair dealings at the CPUC had been severely compromised. But to simply invalidate the settlement and go back to the hearing room would essentially give Edison the opportunity to litigate for an outcome that may be worse than the settlement. Edison should not be given a second bite at the apple. But if the CPUC were to scrap the SONGS settlement, ORA is prepared to vigorously litigate for a better outcome.

Alternately ORA recommends, at a minimum, Edison be sanctioned and required to return to ratepayers an additional $648 million, which represents the difference between ORA's original litigation position and what the settlement provided. Furthermore, as more information is developed in the investigation that determines the extent to which Edison worked to mislead the CPUC by artifice or false statements, Edison should be further sanctioned.

53.     On April 27, 2015, ANR filed with the CPUC a petition seeking modification of the November 20, 2014 Decision. The petition raised two fundamental arguments: "one concerning extrinsic fraud by SCE, which severely prejudiced [ANR] (and other non-utility parties) and prevented it (and them) from effective participation in the [SONGS OII proceeding]," and the other "concerning SCE's fraud-by-concealment, which induced a legally defective settlement agreement in [the SONGS OII proceeding]."   According to ANR, "[t]he content of the [Warsaw Meeting]

Notes, and the failure of SCE to properly disclose the oral and written *ex parte* communications memorialized by the Notes, constitute what the [CPUC] has previously characterized as 'new facts or circumstances which create a strong expectation that we would have made a different decision in a prior order.'" The petition states that had ANR been aware of the March 26, 2013 *ex parte* communications in Poland, it would have contested numerous elements of the design and execution of the SONGS investigation:

> SCE's exclusive knowledge of the oral and written communications in the collateral Peevey-Pickett meeting unfairly deprived [ANR] and other parties of the ability to fully participate in [the SONGS proceeding].

> \* \* \*

> Speaking only for itself, had [ANR] received timely notice of Mr. Pickett's March 26, 2013 oral and written *ex parte* communications to Mr. Peevey, including a copy of the Notes, it would have:

> \* \* \*

> • attended the March 27, 2014 "settlement conference" required by Rule 12.1(b) and pointed out that, in negotiating with the Office of Ratepayer Advocates ("ORA") and The Utility Reform Network ("TURN"), SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

> • documented in its May 7, 2014 Opening Comments Opposing the Proposed Joint Settlement Agreement (and reiterated in its May 22, 2014 Reply Comments) that, in negotiating with ORA and TURN, SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

> • cross-examined the witnesses from SCE, ORA, and TURN at the May 14, 2014 evidentiary hearing on how their claim that the Proposed Joint Settlement Agreement reflected "a hard fought process over many months" could be reconciled with a result $1.419 – 1.438 billion inferior to that articulated by Mr. Peevey in the Notes;

> • identified in its September 15, 2014 Comments on the Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement that, despite the improvements represented by the requested modifications, the result remained $1.239 – 1.309 billion inferior to the position articulated by Mr. Peevey in the Notes[;]

- argued in its October 29, 2014 Opening Comments on the Proposed Decision approving the Amended and Restated Settlement Agreement (and reiterated in its November 3, 2014 Reply Comments) as well as in its October 31, 2014 oral argument to the full Commission that – notwithstanding the "hard-fought process" and the requested modifications to correct "provisions which unfairly disfavor ratepayers" – the Commission was being asked to approve an outcome $1.239 –1.309 billion worse for ratepayers than the position articulated by Mr. Peevey in the Notes.

54.     On April 28, 2015, Edison filed with the SEC its Form 10-Q for the first quarter of 2015, which disclosed:

**San Onofre Proceedings, Recoveries, and Decommissioning**

As discussed in the 2014 Form 10-K, in November 2014, the CPUC approved the San Onofre OII Settlement Agreement that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth. The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries.

A federal lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application to the CPUC for rehearing of its decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On April 16, 2015, a ruling was issued dismissing the federal lawsuit with prejudice.

In February 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

On April 14, 2015, the OII ALJs ordered SCE to produce unprivileged documents pertaining to oral and written communications regarding the possible settlement of the OII proceeding between any SCE employee and CPUC decision makers. SCE's response is due on April 29, 2015.

1
2
3
4
5
6
7
8

On April 17, 2015, ORA and TURN issued press releases asking the CPUC to impose penalties on SCE in connection with the *ex parte* communication. ORA recommended penalties in the amount of $648 million, representing ORA's calculation of the difference in ratepayer value between ORA's initial negotiating position in the SONGS OII and the approved settlement. TURN did not recommend a penalty amount. Neither party asked the CPUC to reopen the settlement. TURN stated that, based on SCE's response to the OII ALJs' April 14, 2015 order, it may seek a reopening of the OII proceeding. On April 27, 2015, the Alliance for Nuclear Responsibility filed a petition to modify the CPUC's decision approving the San Onofre OII Settlement Agreement due to the *ex parte* communication. The petition seeks the reversal of the decision approving the San Onofre OII Settlement Agreement and reinstatement of the OII proceeding.

9
10

SCE cannot predict the outcome of these proceedings.

***In Response to the CPUC's Directives, the Company Produces Hundreds of Pages of Previously Undisclosed Ex Parte Communications***

11
12
13

55.    On April 29, 2015, in response to ALJ Darling and ALJ Dudney's April 14, 2015 ruling, the Company filed a production that included hundreds of pages of previously undisclosed *ex parte* communications (the "April 29, 2015 Filing").

14
15
16
17
18
19
20
21
22
23
24
25

56.    In a declaration from Pickett that was included with the April 29, 2015 Filing (the "Pickett Declaration"), Edison revealed that as early as April 1, 2013, Pickett had briefed senior Edison executives about the Warsaw Meeting.  Those senior executives included Craver, then-SCE President Ron Litzinger ("Litzinger"), Edison Chief Financial Officer Jim Scilacci, and Edison then-General Counsel Robert Adler.  After the briefing session, Pickett sent the senior executives an e-mail attaching a typed document, authored by Pickett, that summarized the Warsaw Meeting. Pickett titled that document, rather tellingly, "Elements of a SONGS Deal."   The Pickett Declaration stated that "Elements of a SONGS Deal" was "intended to be an internal outline that could serve as a basis for discussing a potential settlement in a deal with consumer and other groups should SCE's efforts to restart SONGS prove unsuccessful."   The Pickett Declaration thus makes clear that knowledge of the Warsaw Meeting reached the highest levels of the Company's management as early as April 1, 2013.

26
27
28

57.    Edison further disclosed that on June 6, 2013, Craver sent Bindra, Schlosberg, Taylor, and White an e-mail describing two improper substantive *ex parte* contacts with former-CPUC President Peevey.  The e-mail specifically describes two conversations with Peevey

referencing the SONGS OII and coordinating public statements and lobbying efforts with the Governor of California. The e-mail states, in pertinent part:

> Wanted to give you a quick report on my phone calls with Governor Brown, Senator Feinstein and Mike Peevey.
>
> * * *
>
> President Peevey—actually two calls, as the first one was interrupted by the Governor's call. Constructive, positive. Glad to get this uncertainty over with and focused on their ratemaking OII. Said he was going out with a statement after our investor call; his statement will focus on "urging the parties to meet and see if they could come up with a settlement to submit to the CPUC" and that he was going to convene a task force of sorts including the two utilities and various state agencies to work on insuring reliability. We talked about my call with the Governor, and I asked him to see if he could get the Governor to say something supportive about our handling of the situation and look forward.

58. Accordingly, a majority of the Board had actual knowledge that high-ranking Edison personnel had repeatedly participated in improper *ex parte* communications with Peevey regarding the SONGS OII and had failed to disclose those communications as required by CPUC rules.

59. Furthermore, the April 29, 2015 Filing also disclosed numerous *ex parte* communications between the Company and the CPUC regarding the Greenhouse Gas Initiative. According to a declaration from Litzinger included with the April 29, 2015 Filing (the "Litzinger Declaration"), Litzinger attended a meeting with then-CPUC President Peevey and CPUC Commissioner Florio on May 2, 2014 wherein:

> Peevey stated he was pleased with the SONGS settlement. President Peevey stated that I probably knew he had talked to Mr. Pickett in Poland. President Peevey waved a set of handwritten notes, but did not give me the notes to read . . . President Peevey told me that the settlement was missing a provision to address the greenhouse gas impacts of the SONGS retirement, and he asked SCE to make a voluntary contribution to the University of California ("UC"), specifically UCLA, for greenhouse gas research. President Peevey stated the contribution should total $25 million over five years, with $4 million a year coming from SCE and $1 million a year coming from SDG&E.

60. The Litzinger Declaration reveals several other interactions between the Company and the CPUC relating to the Greenhouse Gas Initiative that took place throughout the duration of

the SONGS OII negotiations.  Those interactions include, most notably, a June 17, 2014 meeting between Peevey and Craver in which the Greenhouse Gas Initiative was discussed.

61.    The April 29, 2015 Filing sent the parties to the SONGS OII into an uproar that included: (i) a motion from ORA seeking an interim ban on communications between SCE and the CPUC; and (ii) an amended  motion from ANR for sanctions; and (iii) a petition from ANR for modification of the settlement based upon the information contained in the April 29, 2015 Filing.

62.    On June 26, 2015, ALJ Darling issued an E-mail Ruling Requesting Supplemental Information From Southern California Edison By July 3, 2015. The ruling directed SCE to produce additional information related to a number of previously undisclosed *ex parte* communications between January 2013 and June 2014, as well as certain items identified on its privilege logs.

63.    On July 3, 2015, Edison responded to ALJ Darling's June 26, 2015 Ruling, and in connection with the response filed 43 additional documents.

64.    During the week of July 6, 2015, numerous media publications reported that the California Attorney General had issued and executed two search warrants, at least one of which involved a search of Edison headquarters, regarding arrangements made between former CPUC President Peevey and Edison.  The search warrants addressed to the Company generally sought:

> Any and all records from January 2012 until current, involving the [SONGS] close settlement agreement, the 2013 meeting between Stephen PICKETT and Michael PEEVEY in Poland, communication(s) pertaining to the determination of when and why SONGS would be closed, commitment of monies for research as a result of the closure of SONGS, and communication(s) pertaining to the settlement of the SONGS [OII].

### *ALJ Darling Finds that the Company Committed 10 Ex Parte Communication Violations and Orders the Company to Show Cause as to Why It Should Not Be Held in Contempt*

65.    On August 5, 2015, ALJ Darling issued a 49-page ruling ordering Edison to file retroactive disclosure notices regarding the e-mails and meetings between Edison and Peevey from March 26, 2013 through June 17, 2014 (the "August 5, 2015 Ruling").  ALJ Darling also gave Edison until August 20, 2015 to show cause why it should not be held in contempt and sanctioned for its flagrant disregard for CPUC's rules for *ex parte* communication disclosure.  Per the ruling, the potentially sanctionable communications "involve statements to the Commission by two SCE

1  executives which I find may reasonably be viewed as misleading the Commission." Those "two

2  SCE executives" are Pickett and Litzinger.

3      66.    The August 5, 2015 Ruling made clear that "[t]he primary catalyst for review of

4  [SCE's] alleged unreported communications was SCE's very late-filed, post-decision disclosure of

5  one or more meetings between former Commission President Michael Peevey and SCE's then-

6  Executive Vice President of External Relations, Stephen Pickett, on or about March 26, 2013."

7      67.    The August 5, 2015 Ruling provided a detailed list of ten (10) violations of Rule 8.4

8  committed by Edison in the context of the SONGS OII, finding that:

9      a)  March 26, 2013 - Poland meeting: Pickett's statements that
        Peevey did all the talking about the possibility of settlement of
10       the SONGS OII were not credible in light of other evidence.
         In particular, the Judge found that Pickett admitted he
11       disagreed with Peevey over treatment of replacement power
         costs and thus, engaged in a substantive communication with a
12       decisionmaker which was not reported until nearly two years
         later, after a decision had been adopted.
13

14      b)  March 27, 2013: Pickett admitted he continued
        communication with Peevey the following night during dinner
15       with others and wrote an internal e-mail that he was
         "working" SONGS at the dinner. Pickett also admitted
16       discussing possible settlement partners with Peevey. Pickett's
         later statement that he did not recall discussing SONGS is less
17       reliable than his contemporaneous internal e-mail. Pickett's
         credibility is adversely impacted by his failure to disclose the
18       true nature of the March 26, 2013 meeting. Thus, the Judge
         held that the evidence weighed in favor of concluding that
19       Pickett communicated with Peevey on substantive issues
         relating to the potential allocation of some costs to be
20       determined in the proceeding.

21      c)  May 28, 2013: Les Starck, the Company's Senior Vice
        President of Regulatory Policy and Affairs, sent an e-mail to
22       all five Commissioners with an SCE press release that
         provided SCE's response to U.S. Senator Boxer's allegations,
23       made in reliance on two letters from SCE to Mitsubishi, the
         generators' manufacturer, from 2004 and 2005, that the NRC
24       and SCE made errors related to the design of the steam
         generators. Although Phase 3 had not yet begun, the
25       Preliminary Scope in the initial OII and the Phase 1 scoping
         memo clearly indicated that the prudency of SCE's actions
26       related to the generators' design were likely to be a factor in
         determining whether the SGRP costs, including for post
27       shutdown repairs, were reasonable. The press release includes
         substantive and argumentative content about SCE's actions
28       and constituted a substantive communication to be determined
         in the SONGS OII.

d)   May 29, 2013: Michael Hoover, the Company's Senior Director of State Energy Regulation, talked to Carol Brown, Peevey's Chief of Staff, and reported to Starck that she told him Pickett was "well prepared in Poland with specifics," but complained that "nothing has happened." The Judge did not believe this to be a non-substantive "one-way" discussion. The press release which prompted the communication was substantive, the topic upon which Pickett was "well-prepared" was much more likely to be possible settlement terms because the status report on the restart request was mostly limited to NRC's regulatory process, i.e., not "specifics" or something that SCE could make "happen."

e)   June 26, 2013: Litzinger gave Commissioner Florio a "brief" update on the status of bargaining efforts regarding employee severance after announcement of the permanent shutdown of SONGS.   The question of SCE's employee compensation commitments and cost recovery of employee severance costs were substantive topics because their reasonableness would be considered by the Commission when reviewing 2013 SONGS Operations and Maintenance expenses.

f)   September 6, 2013: Lunch meeting with Peevey, Litzinger and "the Chino Hills team" during which they discussed, inter alia, delaying any decision on SCE's 2012 ERRA proceeding regarding replacement power costs until a settlement was adopted in the SONGS OII. Starck's internal e-mail to Pickett states that Litzinger offered his view in opposition to Peevey's approach by which SCE would get either replacement power costs or its capital investment but discussion of possible outcomes of SCE's cost recovery claims for replacement power and capital investment at SONGS. Notably, at least one person at SCE advised Starck to check with Hoover about whether to report the "potential ex parte communication," to which Hoover replied that Starck "should not put this in his notes." These latter e-mails also suggest that some SCE personnel were not committed to full disclosure of ex parte communications.

g)   November 15, 2013: Craver had a dinner meeting with Peevey where he discussed efforts to bring Mitsubishi to the negotiating table regarding SCE's warranty claim, and efforts to gain written support from federal officials. Some aspects of SCE's litigation of its claims against Mitsubishi is within the Preliminary Scope of "ratemaking issues related to warranty coverage…of SONGS costs.["] The diligence of SCE's actions to pursue alternate sources of funds to cover shutdown-related costs were relevant to the reasonableness of its actions after shutdown and funds recovered from Mitsubishi would be considered by the Commission to offset cost allocations to ratepayers in a later phase. Therefore, the communication was substantive because it concerned matters to be determined in the OII and of interest to other parties.

h)   May 28, 2014: Hoover met with Peevey who said he "talked to you and Ron about [the Greenhouse Gas Initiative] and was not pleased that SCE was hesitant to contribute funds to the Center for Sustainable Communities at UCLA as part of the SONGS settlement." Peevey asked Hoover to tell SCE he would hate to see the tight schedule for the settlement slip, but no evidence that Hoover responded substantively. SCE's disclosures and the e-mail support that an unreported communication occurred between Litzinger and Peevey in which the substantive issue of a possible settlement provision to address greenhouse gas impacts was discussed. However, the evidence does not support that the communication between Hoover and Peevey was substantive.

i)   June 11, 2014: Peevey called Hoover to his office to discuss the greenhouse gas issue, asked Hoover to deliver his letter to Litzinger which had several letters attached. The letters were written to the Commission by several public officials urging the Commission to support greenhouse gas research. Hoover transmitted the materials to Litzinger. The evidence is that "Peevey talked with Ron last week" and then lowered the requested annual research amount to $3 million. It is more credible that such a discussion was two-way because a significant change occurred in the parameters of a disputed issue related to the settlement of the OII. The public officials' letters may also have been unreported *ex parte* communications but are not at issue as to SCE.

j)   June 17, 2014: Peevey met with Craver about the greenhouse gas issue but Craver states he responded that he could not engage with Peevey on that topic. Although characterized by SCE as "one-way," the evidence indicates that it was more likely two-way and substantive. The e-mail states, "Ted just came and got Peevey" and the meeting was "about UCLA." This is a substantive topic to be determined in the OII and other parties might seek to contest the issue.

68.   On August 11, 2015, ORA filed a petition requesting the CPUC to "overturn its decision adopting the [SONGS] settlement and reopen the SONGS investigation to all for resolution through litigation rather than through settlement." ORA states, in pertinent part, that:

ORA was extraordinarily troubled by the revelations of *ex parte* communication violations and, in fact, filed its own motion to bar any future *ex parte* communications by any parties for any purpose in the proceeding. ORA believed then, as it does now, that the appropriate way to address the massive and pervasive violations is to extract sufficient financial concessions (not limited to penalties that would inure to the State of California) that would remove any conceivable benefit Edison might have achieved as a result of the unlawful communications. ORA believes that the additional appropriate amount that should flow from Edison to ratepayers should be at least $648 million, the difference between the settlement amount and

ORA's initial litigation position prior to the state of settlement negotiations.

ORA therefore determined that it would not join the effort to reject the settlement, but rather reluctantly honor its commitment to support the settlement. However, circumstances have since changed and ORA now takes the position that ratepayers and the public generally are better served by allowing ORA, TURN, A4NR and other consumer groups to work towards a litigated outcome for all issues in the SONGS investigation docket. Based on the August 5, 2014 ALJ Amended Ruling, it does not appear possible that ORA can achieve the amount of reimbursement it believes would compensate ratepayers for Edison's unlawful activities that undermined the SONGS settlement negotiations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of Edison to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants, as alleged herein.  Plaintiff will adequately and fairly represent the interests of Edison in enforcing and prosecuting Edison's rights and Plaintiff has retained counsel experience in prosecuting this type of action.

70.     Plaintiff has continuously been a shareholder of Edison at all times relevant to the wrongdoing complained of and is a current Edison shareholder.  Edison's Board consists of the following eight (8) Individual Defendants: Craver, Bindra, Chang, Schlosberg, Stuntz, Tauscher, Taylor, and White, as well as non-defendant director William Sullivan. Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the following reasons:

a.     Defendant Craver was well aware of the improper *ex parte* communications, as well as the fact that the communications had not been disclosed as required by CPUC rules. According to documents produced in the CPUC proceeding, Craver was a participant in improper and undisclosed *ex parte* communications that were fraudulently concealed in June and November of 2013 and June of 2014.  Furthermore, as early as April 1, 2013, Craver had actual knowledge of the *ex parte* Warsaw Meeting when Pickett briefed Craver on said meeting and e-mailed Craver the document titled "Elements of a SONGS Deal."  Accordingly, Craver is substantially likely to be held liable for breaching his fiduciary duties to Edison.

b.      Defendants Bindra, Schlosberg, Taylor, and White also had actual knowledge of improper *ex parte* communications, as well as the fact that the communications had not been disclosed as required by CPUC rules.  In particular, Bindra, Schlosberg, Taylor, and White received an e-mail from Craver on June 6, 2013 describing two improper, substantive, *ex parte* contacts with former-CPUC President Peevey concerning the SONGS OII.   As a result, Bindra, Schlosberg, Taylor, and White knew *ex parte* communications were occurring and that these communications were designed to influence the SONGS proceeding.  These defendants knowingly failed to ensure that the Company disclosed these communications as it was required to do.  Accordingly, Bindra, Schlosberg, Taylor, and White are substantially likely to be held liable for breaching their fiduciary duties to Edison

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

71.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

72.    The Individual Defendants owe and owed to the Company the fiduciary duties of loyalty and good faith, pursuant to which they were required to, among other things, exercise good faith to ensure that the Company complied with applicable legal and regulatory requirements.

73.    Each of the Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly causing or allowing Edison to participate in improper *ex parte* communications with the CPUC and fail to disclose them as required by CPUC rules, as alleged in detail herein.

74.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Edison has sustained and will continue to sustain damages, including, but not limited to, costs and expenses incurred in connection with the various civil and criminal proceedings and investigations described herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.      Awarding to Plaintiff the costs and disbursements of the action, including, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.


Dated:  August 31, 2015                          Respectfully submitted,

                                                 **KESSLER TOPAZ**
                                                 **   MELTZER & CHECK, LLP**

                                                 /s/ Eric L. Zagar
                                                 Eric L. Zagar (250519)
                                                 Robin Winchester
                                                 Christopher M. Windover
                                                 280 King of Prussia Road
                                                 Radnor, PA 19087
                                                 Telephone: (610) 667-7706
                                                 Facsimile: (610) 667-7056

                                                 -and-

                                                 Eli R. Greenstein (217945)
                                                 One Sansome Street, Suite 1850
                                                 San Francisco, CA  94104
                                                 Telephone: (415) 400-3000
                                                 Facsimile: (415) 400-3001

                                                 *Counsel for Plaintiff*

**VERIFICATION**

I, Roger E. Ekman, Trustee of the Roger E. Ekman Revocable Trust, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint (the "Complaint"), that I have reviewed the Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: 8-25-2015

**Roger E. Ekman, Trustee**
**Roger E. Ekman Revocable Trust**